# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE

| | |
|---|---|
| PAULA E. BABB, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No._____ |
| ) | |
| MARYVILLE ANESTHESIOLOGISTS ) | |
| P.C., ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

### PARTIES

1. Plaintiff Paula E. Babb is a citizen and resident of the State of Tennessee.

2. Defendant Maryville Anesthesiologists, P.C. is a professional corporation organized and operated under the laws of the State of Tennessee, which is located in and conducts business in Tennessee in this district. Defendant may be served upon its registered agent, Cheryl Coleman, MD, 6501 Deane Hill Dr., Knoxville, TN 37919-6006.

3. Defendant is an employer within the meaning of state and federal law and has more than 14 employees. Defendant is a "covered entity" under the Americans with Disabilities Act ("ADA") 42 U.S.C. §12112, *et seq*.

### JURISDICTION AND VENUE

4. This Court has jurisdiction to hear this case pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, including the Americans with Disabilities Act (ADA) and ADA Amendments Act of 2008 (ADAAA).[1]

---

[1] The ADAAA was enacted on September 28, 2008 and became effective on January 1, 2009. Final regulations implementing the ADAAA were issued by the EEOC on March 25, 2011 (76 Fed. Reg. 16978). The effect of the ADA Amendments Act and EEOC's final regulations is to make it easier for individuals claiming protection under the law to establish that they have disabilities (including perceived disabilities).

5. This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. §1367, because the claims are so related to the federal claims that they form part of the same case or controversy.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Plaintiff was employed in this district, and the conduct giving rise to Plaintiff's claims occurred within this division and district.

7. Within 300 days after the unlawful employment practices alleged herein occurred, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"). The EEOC assumed jurisdiction and processed Plaintiff's charge. Thereafter, the EEOC issued Plaintiff a Notice of Suit Rights, under which Plaintiff had 90 days to file a lawsuit. Plaintiff is filing this action within such 90-day right to sue period.

## FACTUAL ALLEGATIONS

8. Plaintiff is a Certified Registered Nurse Anesthetist ("CRNA"). She has worked as a CRNA since receiving her certification in 2006 from the University of Tennessee, Chattanooga ("UTC"). She also received her Masters of Science in Nursing from UTC in 2006.

9. Plaintiff received her BS in Nursing from UTC is 1996.

10. Defendant is in the business of providing anesthesiology services to local hospitals, surgery centers and other medical providers.

11. Upon information and belief, Defendant has 15 or more employees.

12. Plaintiff was employed as a nurse anesthetist by Defendant. She began her employment on June 1, 2015. Prior to working for Defendant, Plaintiff had extensive training and experience as a nurse anesthetist, specifically including (in reverse chronological order):

- Working as a Nurse Anesthetist at American Anesthesia of Tennessee/Mednax from December 2012 to April 2015, where

Plaintiff provided anesthesia care from induction to emergence at several different facilities throughout the Knoxville area, including Physicians Regional Medical Center Downtown, Tennova Hospital and Outpatient Center in Turkey Creek, Tennessee Valley Eye Center and North Knoxville Medical Center.

- Working as a Nurse Anesthetist for Independence Anesthesia Services from June 2012 to August 2012, where she was assigned to Grady Memorial Hospital; Atlanta, Georgia, a 953 bed facility (the largest public hospital in the state of Georgia and one of the busiest Level I Trauma Centers in the country)

- Working as a nurse anesthetist from August 2011 to October 2012 at Odyssey Staffing, with assignments at (i) Columbus Regional Hospital/The Medical Center in Columbus, GA, (ii) Albemarle Hospital in Elizabeth City, NC, and (iii) Roanoke Chowan Hospital in Ahoskie, NC.

- Working as a nurse anesthetist at AMSurg Anesthesia where she was assigned to Digestive Disorder Endoscopy Center in Chattanooga, TN.

- Working as nurse anesthetist for Anesthesiology Associated, PC Chattanooga, TN from November 2006- June 2011.

13. In short, Plaintiff was fully qualified for the position of nurse anesthetist while employed by Defendant, with or without accommodation.

14. However, Defendant regarded Plaintiff as disabled because she has idiopathic juxtafoveal retinal telaniectasis ("IJRT") - a rare disease that can cause progressive vision loss.

15. Prior to learning that Plaintiff had IJRT, Defendant was completely satisfied with Plaintiff's performance. There were never any formal complaints about Plaintiff's performance, written notices given to Plaintiff that she was being reprimanded, or any other forms of written discipline.

16. However, after Defendant learned of Plaintiff's condition through employment-related medical inquiries, it began discriminating against her due to this perceived disability which ultimately led to Defendant terminating Plaintiff's employment.

17. Defendant's discrimination against Plaintiff started a few months after she was hired – when Defendant's employee, Dr. Cheryl Coleman, commented to Plaintiff that she had been told Plaintiff was looking at monitors and patient records at close range. In response, Plaintiff advised Dr. Candace Robertson in a subsequent meeting that she had IJRT.

18. Defendant, acting through its shareholder physicians, then began treating Plaintiff as a disabled person, although Plaintiff was able to perform all functions of her job as a CRNA.

19. Defendant continually treated Plaintiff differently than other employees.

20. Eventually, Defendant sought reasons to terminate Plaintiff due to the perception that she suffered from a physical disability.

21. In November 2015, Plaintiff received a text from Dr. Wilma Proffitt asking about her upcoming appointment with her ophthalmologist, Dr. Tony Leach, which was scheduled for December 2015.

22. Defendant requested that Dr. Leach provide it a current assessment of Plaintiff's condition and confirmation that Plaintiff could perform her job. However, Defendant did not provide any job descriptions to Plaintiff when she was hired or when it requested confirmation of her "fitness for duty."

23. Upon information and belief, Defendant did not have any such formal requirements and Defendant's request was a ruse to unlawfully obtain specific personal medical information about Plaintiff's condition so that it could use the information to justify terminating Plaintiff.

24. However, Defendant never followed up with Plaintiff regarding Dr. Leach's assessment before Defendant terminated Plaintiff.

25. On January 14, 2016, Plaintiff was terminated by Defendant.

26. Plaintiff's termination resulted from Defendant's discrimination due to her perceived disability. As justification for the unlawful termination, Defendant claimed that Plaintiff had ongoing performance issues, which was not true.

27. Tellingly, Plaintiff was never given a chance to address the alleged (but non-existent) performance issues before she was fired. But for Defendant's discrimination against Plaintiff due to her perceived disability, Plaintiff would have been provided an opportunity to defend herself and the care she provided to her patients.

28. Equally, if not more revealing, some of the instances of alleged performance issues which Defendant attempted to use to justify Plaintiff's termination dated back to October 2015; if Defendant truly believed the alleged events took place and demonstrated that Plaintiff was not providing appropriate care to patients, Defendant would not have allowed Plaintiff to continue working through mid-January.

29. Defendant's true reason for terminating Plaintiff (its perception that she suffered from a disability) was revealed in an email dated January 14, 2016, from Crystal Aycocke, another CRNA employed by Defendant, to other nurse anesthetists, which stated:

> As most of you know, Paula has been having major issues with her eyesight and as of late, it has seemed to be getting even worse. We have had numerous complaints from OR staff regarding her inability to read the monitor, etc. Over the past several months the group has given her several opportunities to provide documentation from her eye specialist saying that she was safe to practice. She was unable to provide this documentation. This, in addition to a few other issues, has forced the group to make a very difficult decision. As of today, she is no longer with our group.

> Sorry to be the bearer of bad news. This was one of the reasons that our meeting was postponed. See you all tomorrow.
>
> Crystal

30. Upon information and belief, Ms Aycocke had learned the information contained in the email from Dr. Wilma Proffitt, who was in the meeting where Defendant's shareholders voted to terminate Plaintiff and who therefore had personal knowledge of Defendant's reasons for firing Plaintiff.

31. After Plaintiff was terminated by Defendant, she sought employment from other anesthesiologist groups in East Tennessee, specifically the Knox County – Blount County area where Plaintiff lived with her family.

32. In early March 2016, Plaintiff was hired to work as needed or "PRN" for Innovative Anesthesia which had contracts to provide nurse anesthetists at locations including Tennessee Endoscopy Center ("TEC") in Maryville, Tennessee and the Center for Digestive Wellness ("CDW") in Kingsport, Tennessee.

33. At this same time, Plaintiff, through legal counsel, was corresponding with Defendant regarding (a) the fact that Plaintiff had not been given a written description of the reasons that she terminated, (b) Plaintiff's request for a written detailed description of the reason(s) for her termination, together with any documentation supporting the termination or any prior discipline of Plaintiff, as well as a copy of her entire personnel file and related documents, and (c) and the January 15, 2016 email referenced above was sent to other employees on January 15,2016 informing them that Plaintiff was being terminated due to issues with her vision.

34. Plaintiff was scheduled to work at TEC in Maryville on March 11, subject to Plaintiff receiving privileges there.

35. Plaintiff submitted extensive paperwork to Pamela Phillips at Innovative Anesthesia and passed a drug screen.

36. Despite receiving privileges at CDW, Plaintiff was denied privileges at TEC.

37. When Plaintiff asked Ms. Phillips why she had been denied privileges, Ms. Phillips stated that TEC refused to give any reason for the denial, although an office manager had told Ms. Phillips the decision was made by the physicians at TEC.

38. Ms. Phillips further stated that CDW had granted privileges to Plaintiff without issue and she did not understand why TEC had denied Plaintiff privileges.

39. The physicians at TEC who denied Plaintiff privileges work with Defendant's physicians/shareholders at Blount Memorial Hospital.

40. Upon information and belief, Defendant's agents advised TEC that Plaintiff had IJRT and that Defendant had fired Plaintiff due to their concerns with her eyesight.

41. Upon information and belief, Defendant, through its physicians/shareholders who were acting as Defendant's agents, disclosed Plaintiff's private medical and employment information to punish Plaintiff for challenging the legality of her termination and to enhance Defendant's ability to defend this litigation.

42. Plaintiff's information and belief is based in part on the temporal proximity between (a) TEC's abrupt decision to deny her privileges at Blount Memorial Hospital and (b) the communications between Plaintiff's legal counsel and Defendant, as well as the fact that the physicians at TEC who denied Plaintiff privileges work with Defendant's physicians/shareholders at Blount Memorial.

43. Defendant actively concealed its unlawful disclosure of Plaintiff's medical and employment information and Plaintiff was unable to sooner file this action due to the necessity

of first obtaining a right to sue letter from EEOC. Accordingly, Plaintiff asserts the tolling of any applicable limitations period for pursuing her claim for invasion of privacy.

44. Revealing a person's private medical and employment information is offensive and objectionable to a reasonable person of ordinary sensibilities, and such information is not of legitimate concern to the public.

45. Publicizing Plaintiff's medical information was an unwarranted, wrongful intrusion into Plaintiff's privacy and directly and proximately caused Plaintiff economic and reputational damage. Furthermore, Defendant's actions violated federal law, including the ADA and the Health Insurance Portability and Accountability Act.

46. As a direct and proximate result of Defendant's unlawful discrimination in terminating Plaintiff in violation of the ADA and ADAAA, Plaintiff incurred and continues to incur substantial loss of wages, earning capacity, and fringe benefits, has suffered emotional distress and anguish of mind, and has suffered, and will continue to suffer, other damages as she will show at trial.

47. Defendant's actions were intentional, willful, wanton, malicious, and in reckless disregard of Plaintiff's legal rights.

## CAUSES OF ACTION
## COUNT I – UNLAWFUL DISCRIMINATION UNDER THE ADA

48. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

49. Plaintiff is a qualified individual whom Defendants treated as disabled, as defined by the ADA, as amended by the ADAAA.

50. In enacting the ADAAA, Congress specifically addressed discrimination against persons such as Plaintiff who suffer discrimination because they are perceived to be (but actually are not) disabled:

8

> This section of the definition of disability [covering persons treated as disabled] was meant to express our understanding that unfounded concerns, mistaken beliefs, fears, myths, or prejudice about disabilities are often just as disabling as actual impairments, and our corresponding desire to prohibit discrimination founded on such perceptions.... We intend and believe that the fact that an individual was discriminated against because of a perceived or actual impairment is sufficient.... If an individual establishes that he or she was subjected to an action prohibited by the ADA because of actual or perceived impairment—whether the person actually has the impairment or whether the impairment constitutes a disability—then the individual will qualify for protection under the Act.

154 Cong. Rec. at S8842.

51. Plaintiff could perform the essential functions of her position with or without reasonable accommodation.

52. Defendant's acts in discriminating against Plaintiff on account of her perceived disability include, but are not limited to, treating her less favorably than similarly situated employees whom Defendant did not perceive or treat as disabled, imposing new and undefined standards upon Plaintiff, and terminating Plaintiff from her employment.

53. Defendant's actions were willful, wanton, malicious, and/or in reckless disregard of Plaintiff's rights.

54. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has been injured and is entitled to judgment and compensation pursuant to the ADA and ADAAA.

### COUNT II – VIOLATION OF ADA CONFIDENTIALITY

55. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

56. Defendant obtained Plaintiff's private medical information through employment related inquiries.

57. Under Section 102 of the ADA, 42 U.S.C. §12112(d)(3)(B), Defendant was required to treat this information "as a confidential medical record."

58. In violation of the ADA's confidentiality requirements, Defendant, through its physicians/shareholders disclosed Plaintiff's private medical information to TEC.

59. Defendant's unlawful disclosure of Plaintiff's protected medical information directly and proximately caused Plaintiff economic loss, emotional distress, and reputational damage.

60. Defendant's actions were intentional, willful, wanton, malicious, and in reckless disregard of Plaintiff's legal rights.

## COUNT III – UNLAWFUL INVASION OF PRIVACY

61. Plaintiff realleges the foregoing paragraphs as if fully rewritten herein.

62. Defendant intentionally publicized Plaintiff's medical and employment information, which constituted an unlawful intrusion into Plaintiff's privacy.

63. Defendant's unlawful invasion of Plaintiff's privacy directly and proximately caused Plaintiff economic loss, emotional distress, and reputational damage.

64. Defendant's actions were intentional, willful, wanton, malicious, and in reckless disregard of Plaintiff's legal rights.

## COUNT IV - INTERFERENCE WITH PROSPECTIVE EMPLOYMENT

65. Plaintiff incorporates and realleges each allegation set forth in the preceding paragraphs of this Complaint.

66. Plaintiff had a reasonable expectation of an employment relationship with TEC, and her business relationship with TEC was entitled to protection under Tennessee law.

67. Defendant was aware of Plaintiff's expected employment relationship with TEC.

68. With the intent to cause harm to Plaintiff's relationship with TEC and through improper means (revealing her private medical and employment history in violation of federal law, including the ADA and the Health Insurance Portability and Accountability Act) and motive (to punish Plaintiff for challenging the legality of her termination and to enhance Defendant's ability to defend this litigation), Defendant unlawfully interfered with Plaintiff's business relationship with TEC by advising physicians at TEC that Plaintiff had IJRT and that Defendant had fired Plaintiff due to concerns with her eyesight.

69. Plaintiff suffered damages as a result of Defendant's unlawful interference with her relationship with TEC.

70. Plaintiff has been damaged by Defendant's unlawful interference with her relationship with TEC, including loss of wages, earning capacity, and fringe benefits, as well as emotional distress and anguish of mind, and has suffered, and will continue to suffer, other damages as she will show at trial.

71. Defendant acted intentionally and with malice in interfering with Plaintiff's business relationships with TEC such that punitive damages should be awarded against it.

## JURY TRIAL DEMANDED

72. Plaintiff demands a jury trial on issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1. That summons be issued and that Defendant be duly served with a copy of this Complaint and required to answer same, and that this Court decree and enter judgment;

2. That the Court decree and enter judgment that Defendant unlawfully discriminated against Plaintiff due to Defendant's misperception and treatment of Plaintiff as disabled;

3. That Plaintiff be awarded judgment for back pay and compensatory damages in such amount as she may prove at trial;

4. That the Court order that Plaintiff be reinstated to her former position by Defendant, or alternatively that she be awarded judgment for front pay in such amount as she may prove at trial;

5. That the Court decree and enter judgment that Defendant unlawfully disclosed Plaintiff's private medical information obtained through employment related inquiries in violation of the ADA, and that she be awarded judgement for compensatory damages in such amount as she may prove at trial;

6. That the Court decree and enter judgment that Defendant unlawfully invaded Plaintiff's privacy and that she be awarded judgement for compensatory damages in such amount as she may prove at trial;

7. That the Court decree and enter judgment that Defendant unlawfully interfered with Plaintiff's prospective employment and that she be awarded judgement for compensatory damages in such amount as she may prove at trial;

8. That the Court award Plaintiff her reasonable costs, plus reasonable attorneys' fees under the ADA;

9. That the Court decree and enter judgment that Defendant's actions were intentional, willful, wanton, malicious, and in reckless disregard of Plaintiff's legal rights and to award and enter judgment in favor of Plaintiff for punitive damages;

10. That the Court award and enter judgment for Plaintiff all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity;

11. That the Court order such other, further, and general relief as is just and proper.

Respectfully submitted this 7th day of June, 2017.

                                                **LACY, PRICE & WAGNER, PC**

                                        By: /s/ James H. Price
                                                  James H. Price (BPR #016254)
                                                  W. Allen McDonald (BPR #016210)
                                                  Michael R. Franz (BPR #031664)
                                                  249 North Peters Road, Suite 101
                                                  Knoxville, Tennessee 37923
                                                  (865) 246-0800
                                                  *Attorneys for Plaintiff Paula E. Babb*