UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

PAULA E. BABB,               )
                                      )
             Plaintiff,       )
                                      )
v.                              )      No.    3:17-cv-242
                                      )             Judge Phillips
MARYVILLE ANESTHESIOLOGISTS,)
P.C.,                         )
                                      )
             Defendant.     )

## MEMORANDUM OPINION

Plaintiff Paula E. Babb worked as a Certified Registered Nurse Anesthetist ("CRNA") for defendant Maryville Anesthesiologists, P.C. ("Maryville Anesthesiologists"), a medical practice group that provides anesthesiology services to Blount Memorial Hospital (the "Hospital") in Blount County, Tennessee. Plaintiff claims that Maryville Anesthesiologists regarded her as disabled due to a vision impairment and terminated her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 (2009). The defendant claims that plaintiff was terminated for legitimate non-discriminatory reasons, namely, that she made serious clinical errors such that she could not provide safe and appropriate patient care.

Maryville Anesthesiologists has filed a motion for summary judgment [Doc. 14], with supporting briefs and materials [Docs. 15, 18, 19, 26], and plaintiff has responded in opposition [Doc. 24]. For the reasons set forth herein, the defendant's motion [Doc. 14] will be **GRANTED**.

## I.     Relevant Facts

Maryville Anesthesiologists provides anesthesiology services to the Hospital in operating rooms and ambulatory surgery centers [Doc. 15-11 at ¶ 3].  Plaintiff began working as a CRNA with Maryville Anesthesiologists around June 2, 2015 [Doc. 15-1 at p. 6].

CRNAs with Maryville Anesthesiologists perform a variety of critical duties including: conducting pre-anesthesia assessments; administering pre-anesthetic medication; administering general and regional anesthesia; performing sedation techniques; conducting invasive and non-invasive monitoring of patient conditions such as heart rate, pulse, heart rhythm, and oxygen; administering airway management techniques, such as intubation and managing ventilation while the patient is paralyzed; monitoring fluid, electrolyte and acid-base levels; monitoring blood loss and pressures; providing acute and chronic pain therapy; and providing post-anesthesia care [Doc. 15-1 at pp. 2—5].  CRNAs perform many of these tasks independently and exercise discretion in performing many of these tasks [*Id*. at p. 5].

Within a few weeks of plaintiff's employment with Maryville Anesthesiologists, Dr. Cheryl Coleman, one of the group's physician-owners, observed plaintiff placing her face very close to a computer screen when looking at it [Doc. 15-4 at ¶¶ 2—3].  Dr. Coleman mentioned her observation and plaintiff responded by stating that she had a

degenerative retinal condition and that she would be blind in ten years [*Id.* at ¶ 3].[1]  Dr. Coleman asked plaintiff to "let us know when she reached the point that she could not function" [*Id.*].  Dr. Coleman reported her concern and her conversation with plaintiff to Dr. Candace Robertson, who was then the chair of the personnel committee for Maryville Anesthesiologists [Doc. 15-2 at p. 22].  Dr. Robertson thereafter monitored plaintiff more closely when she was placing a patient under anesthesia or bringing a patient out of anesthesia [*Id.* at p. 23].

In late October 2015, two other physicians reported concerns about plaintiff's performance to Dr. Robertson.  On October 25, 2015, Dr. Gaelan Luhn sent an e-mail to Dr. Robertson describing a comment from plaintiff that she could not read a record of a patient's anesthesia history – "I can't read that" [Doc. 15-11 at ¶ 5, p. 4].  Dr. Luhn did not follow up on plaintiff's comment because the morning surgery schedule was very busy [*Id.*].

On October 28, 2015, Dr. Daniela Apostoaei sent a memo to Dr. Robertson describing two occasions when plaintiff responded to questions about whether pre-operative blood results were within normal limits by stating, "I cannot see that" [Doc. 15-11 at ¶ 6, p. 5].  Dr. Apostoaei was concerned that plaintiff "did not take any further necessary steps to ensure that those blood work results where [sic] acceptable before proceeding with surgery" [Doc. 15-11 at p. 5].  Dr. Apostoaei also advised that two nurses

---

[1]Plaintiff states that she has to hold paperwork close to her eyes and it takes her longer to focus, but she disputes that she ever told anyone she would be blind in ten years "because that is not true" [Doc. 24-3 at ¶ 11].

reported that plaintiff "does not appear to see the monitor to document the vitals" [*Id.*].[2]

Plaintiff admits that she was unable to read the patient record, but she claims that Dr. Apostoaei asked her for the exact readings from the blood work, not simply whether the results were within normal limits [Doc. 24-3 at ¶ 14]. According to plaintiff, she responded that she did not recall the exact number, not that she could not see it. She further claims she had already confirmed the blood work results were within an acceptable range before proceeding with surgery [*Id.*].

On October 30, 2015, Dr. Robertson and another physician, Dr. Wilma Proffitt, met with plaintiff and described the concerns that had been expressed regarding her ability to read records and monitors [Doc. 15-11 at ¶ 7]. They emphasized that these issues – reading records and monitors – impacted patient care and safety [Doc. 15-11 at p. 6]. Plaintiff responded that she felt her vision was stable and that she could perform her job duties [*Id.*]. She commented that she had known about her eye condition for about ten years and that she was followed by an ophthalmologist in Chattanooga [*Id.*]. Plaintiff also stated that she had disability insurance [Doc. 15-11 at p. 6]. The doctors instructed plaintiff to ask for help with any record she could not read [*Id.*]. Drs. Robertson and Proffitt asked plaintiff to follow up with her ophthalmologist and provide them with "an objective assessment of her vision," which she agreed to do [Doc. 15-11 at p. 6].[3] However, plaintiff never

---

[2]The nurses, Deborah Everett and Markie Williams, were employed by the Hospital [Doc. 15-6 at ¶¶ 2—3; Doc. 15-12 at ¶¶ 2—4].

[3]Plaintiff describes this request as a "fool's errand" and "pointless" because Dr. Robertson's e-mail summary of the October 30 meeting to the other physicians opined that "[w]e all know that an ophthalmologist is not going to 'clear' her to do anesthesia" [Doc. 24 at pp. 6, 18; Doc. 15-11 at p. 6].

provided her employer with a report from her ophthalmologist or any other treatment provider [Doc. 24-1 at pp. 64—65].

Several CRNAs testified that it was "common knowledge" that plaintiff had issues with her vision [Doc. 15-3 at ¶ 7; Doc. 15-5 at ¶ 3; Doc. 15-13 at ¶ 3]. There is evidence that other CRNAs and Hospital staff expressed concerns over plaintiff's ability to read monitors and patient records and some of those concerns were relayed to the physicians [Doc. 15-6 at ¶ 3; Doc. 15-10 at ¶¶ 7—8; Doc. 15-12 at ¶ 4]. Two of the Hospital's surgeons requested that plaintiff not work in their operating room due to concerns about her vision [Doc. 15-2 at p. 30].

On January 2, 2016, Dr. Proffitt sent Dr. Robertson an e-mail describing concerns from operating room staff that plaintiff could not see and read the monitors [Doc. 15-11 at ¶ 9, p. 7]. Dr. Proffitt also described an incident involving a patient on a fracture table in which the patient began to wake up too soon and moved, thus almost causing the patient to fall from the table [Doc. 15-10 at ¶¶ 4—5; Doc. 15-11 at ¶ 10, p. 7]. A fracture table is thin, narrow operating table that allows the surgeon to stand very close to the affected area [Doc. 15-11 at ¶ 10]. Because the fracture table is so thin, safety protocols require that the patient remain asleep until transferred off of the table [Doc. 15-11 at ¶ 10]. Plaintiff admits that the patient in question did move; fortunately, other staff members reacted and prevented the patient from falling [Doc. 15-10 at ¶ 4]. Registered Nurse Charles Price

reported this incident to Dr. Proffitt in late December 2015 [Doc. 19-1 at ¶ 7; Doc. 19-2 at ¶ 3]. [4]

On January 5, 2016, Dr. Luhn related to Dr. Robertson an incident in which plaintiff had not adequately sedated a patient prior to a robotic surgery [Doc. 15-11 at ¶ 11, p. 8]. Another CRNA, Lisa Green, entered the robotic surgery room to give plaintiff a break [Doc. 15-7 at ¶¶ 6—7]. Ms. Green became very concerned when she observed that the patient had four twitches, or movements, and she "dosed the patient right away" [*Id.* at ¶ 7]. A patient having robotic surgery should have zero twitches; four twitches is the highest level that CRNAs measure [Doc. 15-7 at ¶ 5]. [5] It is very dangerous for a patient to not be adequately relaxed before a robotic surgery because the robot is rigid and does not move [Doc. 15-7 at ¶ 4; Doc. 15-11 at ¶ 12]. If a patient moves during a robotic procedure, the patient can be seriously injured [*Id.*]. Ms. Green reported to Dr. Luhn, the free anesthesiologist on duty that day, that the patient had four twitches [Doc. 15-7 at ¶ 8; Doc. 15-9 at ¶ 3]. When Dr. Luhn entered the room an hour later, he observed that the patient again had four twitches, thus the paralytic agent had begun to wear off [Doc. 15-9 at ¶ 3].

---

[4]Although the parties initially disputed whether this surgery occurred in October or December 2015, it now appears that they agree this incident happened in October. There is some dispute whether the patient was male or female. It does not appear disputed, however, that Mr. Price reported this incident to Dr. Proffitt in December 2015 and it came to Dr. Robertson's attention in January 2016.

[5]By way of explanation, plaintiff states that a twitch monitor is attached to the patient and a machine sends a stimulant to the patient and records the patient's reaction to the stimulant [Doc. 24-3 at ¶ 17]. A patient in complete paralysis will have zero twitches but may have up to four twitches as the paralytic wears off [*Id.*]. Plaintiff also notes that the machine only reads the number of twitches every 15 minutes, so a patient may go from zero to four twitches between readings [*Id.*]. Because of this, on occasions when she has relieved another CRNA and the patient had four twitches, plaintiff contends that a patient with four twitches was not considered a serious problem by her, the surgeon, or anyone else, and was not evidence of a clinical error [*Id.* at ¶ 18].

Dr. Luhn brought this to plaintiff's attention and she responded that there are different ways of doing things [Doc. 15-9 at ¶ 3].[6]

On January 8, 2016, Dr. Apostoaei reported to Dr. Robertson that plaintiff wrote the wrong dosage of medicine on a patient record [Doc. 15-11 at ¶ 13, p. 9]. A nurse caught the error and corrected it [Doc. 15-11 at p. 9]. Plaintiff admits this error [Doc. 15-1 at pp. 13—14].

At the January 13, 2016 monthly meeting of the physician-owners, those present discussed the recent surgical incidents involving plaintiff and the issues with her sight reported from Hospital employees [Doc. 15-11 at ¶ 15]. Dr. Luhn described the robotic surgery incident and the physicians discussed the comments from operating room staff regarding plaintiff's inability to see monitors or read records [*Id.*]. The physician-owners who were not present were called and informed of the concerns [*Id.*]. Because of plaintiff's clinical errors, particularly the two surgical incidents, the physician-owners concluded that plaintiff could not provide safe and appropriate patient care and they voted unanimously to discharge plaintiff [*Id.*]. Dr. Robertson opines that clinical errors, such as bringing someone out of anesthesia too soon or failing to ensure a patient is fully relaxed during a robotic surgery, are different than having difficulty reading records or information on a monitor [Doc. 15-11 at ¶ 14]. Clinical errors demonstrate a lack of clinical knowledge or judgment or both [*Id.*].

---

[6]Plaintiff disputes when Dr. Luhn entered the surgery room and whether Ms. Green had "dosed the patient."

On January 14, 2016, Drs. Luhn and Shivers met with plaintiff and told her that Maryville Anesthesiologists was ending her employment [Doc. 15-1 at pp. 13—15]. When plaintiff asked why, Dr. Luhn referenced the fracture table and robotic surgery incidents, as well as her charting of the wrong dose of morphine [*Id.*]. Plaintiff asked them to reconsider the decision and Dr. Luhn stated that he would speak to the other physicians again [*Id.* at p. 14]. On January 18, 2016, plaintiff e-mailed Dr. Robertson and inquired about her employment status [Doc. 15-14]. Dr. Robertson confirmed that plaintiff's last day of employment was January 14 and that the fracture table and robotic surgery incidents were the reasons for her termination [*Id.*].

On January 14, 2016, Dr. Proffitt instructed Crystal Aycocke, a CRNA who assisted the group with scheduling, to notify the other CRNAs that plaintiff was no longer employed with Maryville Anesthesiologists and the other CRNAs would have to cover additional shifts due to her departure [Doc. 15-3 at ¶¶ 4—5]. Neither Dr. Proffitt nor any other physician told Ms. Aycocke the reason why plaintiff was no longer employed [Doc. 15-3 at ¶ 5, 10]. That evening, Ms. Aycocke sent the following e-mail to the other CRNAs:

> As most of you know, Paula has been having major issues with her eyesight and as of late, it has seemed to be getting even worse. We have had numerous complaints from OR staff regarding her inability to read the monitor, etc. Over the past several months the group has given her several opportunities to provide documentation from her eye specialist saying that she was safe to practice. She was unable to provide this documentation. This, in addition to a few other issues, has forced the group to make a very difficult decision. As of today, she is longer with our group. Sorry to be the bearer of bad news. This was one of the reasons that our meeting was postponed. See you all tomorrow.

[Doc. 15-3 at p. 2]. Ms. Aycocke drafted the e-mail based on her own opinion without input from the physicians or any pre-approval [Doc. 15-3 at ¶¶ 6, 10—11].

The record contains evidence that Maryville Anesthesiologists has discharged two other CRNAs who, in their opinion, lacked the clinical skills necessary for the job [Doc. 15-8 at ¶ 3; Doc. 15-11 at ¶¶ 17—18]. Neither Camille Fritz nor David Kinlaw were given warnings or other progressive discipline prior to their terminations [*Id.*]. Dr. Robertson stated that the practice does not utilize progressive corrective action when a CRNA displays a lack of clinical skills or judgment because the CRNAs must function independently [Doc. 15-11 at ¶ 19]. If they cannot do so safely, they create a risk for patients in a very vulnerable position [*Id.*].

## II.    Plaintiff's Expert Report

In support of her opposition to summary judgment, plaintiff has filed the Declaration and Expert Report of Jennifer W. Hultz [Doc. 24-8], a CRNA who has opined on plaintiff's actions in the two contested surgical cases and whether her actions complied with the appropriate standard of care for CRNAs. In the reply brief, Maryville Anesthesiologists argues that Ms. Hultz's expert report should be excluded in considering the motion for summary judgment [Doc. 26 at pp. 5—8]. Defendant does not challenge Ms. Hultz's qualifications to provide expert testimony. Instead, defendant argues that the testimony is not helpful or necessary for the jury to understand the facts and that the testimony regarding the standard of care is not relevant or helpful [*Id.*]. Plaintiff has not responded to defendant's request to exclude the expert report.

In her declaration, Ms. Hultz concludes that "there is reason to doubt Maryville Anesthesiologists new version of what happened in the robotic surgery on January 5, 2016" [Doc. 24-8 at ¶ 11]. Ms. Hultz also describes Mr. Price's confusion as to when the fracture table surgery occurred as "very difficult to accept" [*Id.* at ¶ 21]. Ms. Hultz concludes that "nothing in this case suggests any legitimate basis to doubt [plaintiff's] ability to practice safe anesthesia care for patients" [*Id.* at ¶ 26]. In her expert report, Ms. Hultz opines that plaintiff's actions in the two surgical incidents "were in all respects appropriate, reasonable, and consistent with the standard of care applicable to CRNAs in Tennessee, and none of Paula Babb's actions in either instance should have subjected her to discipline, much less termination, by her employer" [Doc. 24-8 at p. 10]. Ms. Hultz also concludes that "Ms. Babb's actions in the two instances described above could not legitimately have been the basis for her termination, because her actions did not fall outside the standard of care" [*Id.* at p. 12].[7]

Fed. R. Evid. 702 permits the consideration of expert testimony "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of this case." The Court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). The relevancy prong, at issue here, requires that the expert

---

[7]The Court notes that Ms. Hultz's declaration also contains certain technical opinions regarding anesthesia care which are not directly pertinent to defendant's challenge of her testimony for purposes of the pending motion [*see* Doc. 24-8 at ¶¶ 13—16].

testimony assist the trier of fact. *Id.* at 591. Particularly relevant here, "it is well-settled that the Court should not admit testimony that is directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help. …Although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *Wilhoite v. Bi-Lo, LLC*, No. 3:06-CV-32, 2007 WL 5117410, at *2 (E.D. Tenn. June 29, 2007).

First, the statements in Ms. Hultz's declaration which question the credibility of other witnesses are not appropriate for consideration on a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (the court may not weigh the evidence or make credibility judgments). It is the province of the jury to assess the credibility of witnesses and the jury is capable of determining which witnesses are believable and which are not. *Smith v. Jones*, 721 F. App'x 419, 423 (6th Cir. 2018) ("[e]xperts may not testify about the credibility of other witnesses").

Second, Ms. Hultz's statements that plaintiff's actions should not have subjected her to discipline or termination and that they were not a "legitimate" basis for her termination are also improper. While these opinions are couched in terms of whether plaintiff performed properly in the two surgical cases, the statements are really telling the jury what result to reach. By opining whether defendant's stated reason for termination was pretextual or not, these statements invade the province of the jury by stating the ultimate legal question. *Wilhoite*, 2007 WL 5117410, at *2; *see Brightwell v. Bandera Cty.*, No. SA-16-CA-1216-XR, 2017 WL 5346393, at *8 (W.D. Tex. Nov. 13, 2017) (expert opinions as to whether employer had a legitimate non-discriminatory reason for

terminating plaintiff improperly invade the province of the jury); *Trentham v. Hidden Mountain Resorts, Inc.*, No. 3:08-CV-23, 2010 WL 11519874, at *3 (E.D. Tenn. Jan. 15, 2010) (human resources expert opinion as to the employment actions taken is "the very task with which the jury is charged"). Accordingly, the Court agrees with Maryville Anesthesiologists and Ms. Hultz's declaration and expert report will not be considered in ruling on the pending motion.

## III.    Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). "Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. 317). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479—80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## IV.    Analysis

Plaintiff's complaint asserts four claims: (1) disability discrimination under the ADA [Doc. 1 at ¶¶ 48—54]; (2) violation of ADA confidentiality [*Id.* at ¶¶ 55—60]; (3) invasion of privacy [*Id.* at ¶¶ 61—64]; and (4) interference with prospective employment [*Id.* at ¶¶ 65—71]. Maryville Anesthesiologists moved for summary judgment on all claims [Doc. 14]. In response, plaintiff concedes that summary judgment is appropriate on Counts Two through Four [Doc. 24 at p. 14, n.16]. Accordingly, the Court will address the only remaining claim: whether summary judgment is appropriate on plaintiff's claim of disability discrimination.

A.    Prima Facie Case

The ADA prohibits covered employers from discriminating against qualified individuals with a disability. 42 U.S.C. § 12112 (2009). A plaintiff may prove that she was discriminated against based on her disability either through direct or indirect evidence. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir.), *cert. denied*, 543 U.S. 817 (2004). Plaintiff has presented no direct evidence of disability discrimination so her claims must be reviewed under the *McDonnell Douglas* burden-shifting framework. *Id.* at 452—53. To state a prima facie case of discrimination under the ADA, the plaintiff must establish that: (1) she is disabled; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of her disability; and (5) the disabled individual was replaced. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 894 (6th Cir. 2016); *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). Furthermore, the plaintiff's disability must be a "but for" cause of the adverse employment action. *Tennial v. United Parcel Serv.*, No. 15-6356, 2016 WL 6156315, at *7 (6th Cir. Oct. 24, 2016); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc).

The plaintiff may establish the first prong of the prima facie case if the plaintiff is regarded by an employer as having a physical or mental impairment that substantially limits one or more of the plaintiff's major life activities ("regarded as disabled").[8] *Gruener v.*

---

[8]In addition to the "regarded as" definition, the ADA definition of "disability" includes (1) an individual with a physical or mental impairment that substantially limits one or more major life activities or (2) an individual who has a record of such an impairment. 42 U.S.C. § 12102(1)(A)-(B) (2009). Neither of these additional definitions are at issue in this case.

*Ohio Cas. Ins. Co.,* 510 F.3d 661, 664 (6th Cir. 2008) (citing *Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 810 (6th Cir. 1999)) (quotations omitted); *see also* 42 U.S.C. §§ 12102(1)(C) (2009).  Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A) (2009).  Neither party addresses which of plaintiff's major life activities is limited, but the Court assumes that "seeing" is the major life activity at issue.[9]

An employee is "regarded as" disabled under the ADA if his or her employer (1) mistakenly believes that the employee has a physical impairment that substantially limits one or more major life activities, or (2) mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities.  *Ferrari*, 826 F.3d at 893; *see* 42 U.S.C. § 12102(3)(A) (2009) ("[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual … has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity"); 29 C.F.R. § 1630.2(g)(1)(iii) (2012) ("[b]eing regarded as having such an impairment … means that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both 'transitory

---

[9]To the extent the plaintiff claims that she was regarded as disabled in the major life activity of working, she would be required to show that she was regarded as precluded from a broad range or class of jobs, not just her job at Maryville Anesthesiologists. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999); *Mahon v. Crowell*, 295 F.3d 585, 591 (6th Cir. 2002).  Plaintiff has presented no such evidence.

and minor'"). "Thus, an individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties." *Ross v. Campbell Soup Co.,* 237 F.3d 701, 706 (6th Cir. 2001).

Maryville Anesthesiologists argues that plaintiff was not regarded as disabled simply because it noticed her conduct or performance issues and requested a fitness for duty evaluation [Doc. 15 at pp. 14—17]. Defendant argues the October 2015 meeting with plaintiff and Drs. Proffitt and Robertson was a reasonable response to reported concerns from other physicians and staff who worked directly with plaintiff. Further, the discharge decision was based on two surgical incidents and a charting mistake which led the physician-owners to conclude that plaintiff could not provide safe and appropriate patient care. Regarding the e-mail from Ms. Aycocke, defendant notes that she was not a decision-maker and therefore her e-mail comments are irrelevant. Defendant also argues that plaintiff cannot show a causal connection between her perceived disability and her termination [*Id.* at pp. 17—18].

In response, plaintiff points to Dr. Robertson's testimony that she asked plaintiff about disability insurance in the October meeting because Dr. Robertson believed plaintiff "might have a disability" [Doc. 24 at p. 17]. Plaintiff relies on Dr. Coleman's statement to Dr. Robertson that plaintiff would be blind in ten years, something plaintiff claims she never said, and to the concerns about her vision reported from other CRNAs as evidence of how she was perceived [*Id.*]. Plaintiff also points to Ms. Aycocke's e-mail statement that plaintiff had "major issues with her eyesight" that "seemed to be getting even worse"

[Doc. 24 at p. 17]. Finally, plaintiff relies on Dr. Robertson's admission that concerns about plaintiff's vision were discussed at the meeting when the decision to terminate was made [*Id*. at p. 18]. Plaintiff further argues that this evidence is sufficient to show that the perception of her vision was a "but for" cause of her termination [*Id.* at pp. 18—19].

Defendant emphasizes prior "regarded as" cases from the Sixth Circuit where the court held that an employer does not regard an employee as disabled by directing the employee to undergo a fitness for duty examination. In *Sullivan v. River Valley Sch. Dist.*, a long-term teacher began engaging in odd and disruptive behavior and the district superintendent became concerned about the plaintiff's fitness for duty. 197 F.3d 804, 808—09 (6th Cir. 1999), *cert. denied*, 530 U.S. 1262 (2000). After an informal consultation with a psychologist, the superintendent recommended and the school board accepted the recommendation that the plaintiff undergo mental and physical fitness-for-duty examinations. *Id*. at 809. The plaintiff refused to do so and was eventually terminated for various acts of misconduct and insubordination. *Id*. at 810. The Sixth Circuit held that the employer's request for the employee to undergo a medical exam "is not enough to suggest that the employee is regarded as … disabled." *Id*. "A request that an employee obtain a medical exam may signal that an employee's job performance is suffering, but that cannot itself prove perception of a disability because it does not prove that the employer perceives the employee to have an impairment that substantially limits one or more of the employee's major life activities." *Id*. at 811. "[E]xpressing concern over an employee's job performance does not show that an employer regards an employee as having a disability that substantially limits a major life activity." *Id*.

The Sixth Circuit reaffirmed the *Sullivan* holding after the 2008 amendments to the ADA. In *Pena v. City of Flushing*, 651 F. App'x 415, 418—19 (6th Cir. 2016), the plaintiff was fired after refusing to attend a medical examination for returning to work after a medical leave. Noting that the "regarded as" definition of the ADA was expanded by the 2008 amendments to the ADA, the Court nevertheless affirmed the holding in *Sullivan*. *Id*. at 420. The Court rejected the argument that referring an employee for a fitness for duty examination when the employer is aware of the employee's medical condition is a per se "regarded as" violation of the ADA. *Id*. Rather, Congress made a "policy choice" when it permitted employers to request a fitness for duty examination so long as the exam was "job-related and consistent with business necessity." *Id*. Thus, both *Sullivan* and *Pena* require the conclusion that defendant's request that plaintiff provide them with "an objective assessment of her vision" from her ophthalmologist, without more, is not evidence that defendant regarded her as disabled.

As noted by the Sixth Circuit, whether a plaintiff was "regarded as" disabled is "a question embedded almost entirely in the employer's subjective state of mind" such that proving the case becomes extraordinarily difficult." *Ross*, 237 F.3d at 709. Mere knowledge of an employee's health problems is not enough to show that the employee was regarded as disabled. *See Wolfe v. U.S. Steel Corp.*, 567 F. App'x 367, 374 (6th Cir. 2016); *Simpson v. Vanderbilt Univ.*, 359 F. App'x 562, 568 (6th Cir. 2009); *Brohm v. JH Props., Inc.*, 149 F.3d 517, 522 (6th Cir. 1998) ("evidence that an employer knows that an employee has a disability is not enough to establish that this knowledge was the basis for termination"). It is undisputed that Maryville Anesthesiologists was aware of plaintiff's

vision issue based on her early conversation with Dr. Coleman, the October 2015 meeting with Drs. Proffitt and Robertson, and the concerns reported by other CRNAs and Hospital employees. But knowledge of her health condition is not enough to show that plaintiff was regarded as disabled without evidence that this knowledge was the basis for her termination.

Although she has not tied it specifically to her prima facie case or her arguments on pretext, plaintiff has submitted a copy of her draft performance evaluation [Doc. 24-11]. It is undisputed that this evaluation was not completed prior to her termination. Per Dr. Robertson's testimony, the physician-owners submitted their comments and evaluations of employees through a confidential web-based program [Doc. 15-2 at pp. 26—27]. Plaintiff's incomplete evaluation included the following comments:

- "not in her control-her vision"

- "I see her questionable ability to see to reflect on how surgeons and the medical staff lack accepting her and thus not want to work with her in the OR. She should be willing to be truthful in times when it is difficult to read medical records."

- "concerned about her eyesight"

- "worried about her eyesight"

[Doc. 24-11 at p. 3]. These comments reflect an awareness of her health condition, which, as noted, is not enough to show that the employee was regarded as disabled. *Wolfe*, 567 F. App'x at 374; *Simpson*, 359 F. App'x at 568; *Brohm*, 149 F.3d at 522. Further, these comments express concern about plaintiff's ability to perform her job as a CRNA, but they

do not show any perception about the impact of her condition on her daily life. "[T]he Court's focus in the regarded as disabled inquiry is not on the defendant's belief about the plaintiff's ability to perform functions on the job, but rather the defendant's belief about 'the effect of the impairment on the individual's daily life.'" *Dunaway v. Ford Motor Co.*, 134 F. App'x 872, 878 (6th Cir. 2005) (quoting *E.E.O.C. v. DaimlerChrysler Corp.*, 111 F. App'x 394, 399 (6th Cir. 2004)). Thus, the draft performance review comments do not show that she was regarded as disabled.

Plaintiff also relies on Ms. Aycocke's e-mail to the CRNAs that plaintiff had "major issues with her eyesight" that "seemed to be getting even worse" as evidence that defendant regarded her as disabled [Doc. 15-3 at p. 2]. Ms. Aycocke states that she composed the e-mail herself without input from or review by any of the physician-owners [Doc. 15-3 at ¶¶ 6, 11] and there is no dispute that she was not a decision-maker with regard to plaintiff's termination. *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004). Thus, Ms. Aycocke's e-mail is not attributable as a statement by the employer as evidence that plaintiff was regarded as disabled.

Finally, plaintiff emphasizes Dr. Robertson's admission that she asked whether plaintiff had disability insurance at the October 2015 meeting because plaintiff "might have a disability" [Doc. 15-2 at p. 14] and defendant's acknowledgement that concerns regarding plaintiff's vision were discussed at the termination meeting. Defendant has emphasized that, although plaintiff's vision was discussed at the termination meeting, it was not a reason for her termination. Because the burden of establishing a prima facie case should not be "onerous," *Ferrari*, 826 F.3d at 894, the Court finds that these facts are some

evidence to satisfy the first prong of a prima facie case, *i.e.*, that she was regarded as disabled.

Defendant next argues that plaintiff cannot show a causal connection between her perceived disability and her termination [Doc. 15 at pp. 17—18]. Defendant contends neither the October 2015 meeting nor Ms. Aycocke's e-mail establish a causal connection.

As with the "regarded as" prong, plaintiff emphasizes Ms. Aycocke's e-mail and the admission that the physician-owners discussed plaintiff's vision at the termination meeting [Doc. 24 at pp. 18—20]. In reply, defendant contends that the two surgical incidents were errors in clinical judgment and not as a result of any issue with her vision [Doc. 26 at pp. 2—3]. Thus, defendant contends there is no evidence that plaintiff's vision was a "but for" cause of her termination.

The Court agrees with plaintiff. Dr. Robertson's belief that plaintiff "might have a disability" and the admission that the defendant discussed her vision impairment during the meeting to terminate her employment is some evidence that the decision, at least in part, was "because of" her vision. Thus, there is a question of fact as to whether plaintiff can establish a causal connection between her perceived vision impairment and her termination.

B. <u>Whether Defendant's Legitimate Non-Discriminatory Reason is Pretextual</u>

Once the plaintiff has established a prima facie case, the burden of production shifts to the defendant to present evidence of a legitimate, non-discriminatory reason for the termination. *Hedrick*, 355 F.3d at 453. Because of the fracture table and robotic surgery incidents, Maryville Anesthesiologists concluded that plaintiff demonstrated a lack of

clinical skill or judgment and that she could not provide safe and appropriate patient care [Doc. 15 at pp. 18—19; Doc. 15-11 at ¶¶ 14—15].  Plaintiff does not really dispute that these are legitimate, non-discriminatory reasons, but instead argues that these reasons are pretext for discrimination [Doc. 24 at pp. 20—25].  The Court agrees that defendant has presented a legitimate, non-discriminatory reason for plaintiff's termination.  *See DiGiosia v. Aurora Health Care, Inc.*, 48 F. Supp. 3d 1211, 1221 (E.D. Wis. 2014) ("[i]t is difficult to think of a more important consideration than patient safety for a health care provider").

To survive a motion for summary judgment, plaintiff need not definitively prove that the defendant's reason is pretextual, but rather "must prove only enough to create a *genuine issue* as to whether the rationale is pretextual." *Ferrari*, 826 F.3d at 895; *Whitfield*, 639 F.3d at 260.  Plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996).  The Sixth Circuit has cautioned against a formulaic application of this test and described pretext as "a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is. ... [A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009); *see E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) ("[t]o demonstrate pretext,

a plaintiff must show *both* that the employer's proffered reason was not the real reason for its action, *and* that the employer's real reason was unlawful") (emphasis in original).

Plaintiff argues that the two surgical incidents relied on by defendant are insufficient to explain her termination, *i.e.*, the third avenue for showing pretext [Doc. 24 at pp. 21—25]. Plaintiff contends there are several disputed facts regarding both surgeries and that these inconsistencies, along with the admission that plaintiff's vision was discussed at the termination meeting, are sufficient to show pretext [*Id.*].

In reply, defendant emphasizes that plaintiff's termination was based on the information it had at the time, even if some of that information later turned out to be incorrect, *i.e.*, the "honest belief" rule [Doc. 26 at pp. 3—5]. Defendant further contends that, even if plaintiff's vision was discussed at the termination meeting, it does not mean that the physician-owners are lying about their reasoning and does not cast doubt on the honesty of their stated reasons [*Id.* at pp. 4—5].

Regarding the fracture table surgery, plaintiff contends that Mr. Price, who reported the incident to defendant, is confusing two surgeries [Doc. 24-3 at ¶ 5]. Plaintiff claims that the fracture table patient Mr. Price described was female, rather than male. She recalls that this surgery was problem-free, even though the case was complex due to the patient's obesity [*Id.* at ¶¶ 3, 6]. Plaintiff recalls a second fracture table surgery involving a male patient who began to move after she had given a reversing agent to allow him to start breathing on his own, but there was no "near fall" as described by Mr. Price [*Id.* at ¶¶ 4, 7]. Plaintiff also makes much of the fact that Mr. Price and Dr. Robertson testified that the fracture table incident occurred during a weekend in December 2015. Mr. Price has since

corrected his testimony to acknowledge that the surgery occurred in October 2015 [Doc. 19-1 at ¶ 5].

Regarding the robotic surgery, plaintiff claims she had not given the patient a muscle relaxant because the robot was not docked; her practice, which she followed in the January 5, 2016 surgery, was not to provide muscle relaxant to paralyze the patient until almost immediately before the surgery began [Doc. 24-3 at ¶ 22]. She claims that Dr. Luhn did not enter the surgery room after the surgery had begun [*Id.* ¶ 21]. She further opines that "there is nothing wrong with a patient having twitches before surgery and especially before the robot is docked for surgery. In fact, allowing the patient to have twitches and continue to have twitches can allow the CRNA to have baseline [sic] of information regarding how the patient metabolizes the anesthesia" [*Id*. at ¶ 20]. In further support of her position, plaintiff claims the surgeon did not ask for the patient to be given more relaxation drugs and records of her work on prior robotic surgery cases were approved without criticism [*Id.* at ¶¶ 23—25].

A defendant is entitled to summary judgment on the issue of pretext by showing its "reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.*; *see Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008) (the inquiry is whether the employer has an "honestly held belief" that the employee committed a terminable offense and whether the adverse decision was a "reasonably informed and considered decision."). The application of the honest belief rule

is not automatic; the plaintiff has the opportunity to present proof to the contrary. *Smith*, 155 F.3d at 807. However, "the plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (citations omitted).

At the time of the physicians' meeting in January 2016, they were presented with the following particularized facts:

(1) Ms. Green entered the robotic surgery room to give plaintiff a break and observed the patient with four twitches [Doc. 15-7 at ¶ 7]. She was very concerned and "dosed the patient" immediately [*Id*.]. Ms. Green also reported this to Dr. Luhn, who was the free anesthesiologist on duty that day [*Id*. at ¶ 8]. After receiving Ms. Green's report, Dr. Luhn went to the surgery room about an hour later and observed the patient had four twitches [Doc. 15-9 at ¶ 3]. When Dr. Luhn mentioned the number of twitches to plaintiff, she responded that there "different ways of doing things" [*Id*.]. Dr. Luhn described these events at the physicians' meeting in January [*Id*. at ¶ 4].

(2) Mr. Price reported an incident to Dr. Proffitt when a patient on a fracture table began to awaken before the patient was moved to a regular bed because plaintiff reversed the anesthetic too soon [Doc. 15-10 at ¶ 4]. Mr. Price also reported this to the Hospital's risk management group within days after it occurred [*Id*. at ¶ 5; Doc. 19-1 at ¶ 6]. Mr. Price reported the incident to Dr. Proffitt in December 2015 and, at that time, believed the surgery had occurred in December [Doc. 19-1 at ¶ 7]. Dr. Proffitt believed that the surgery had occurred in December 2015 and she reported this to Dr. Robertson on January 2, 2016 [Doc. 19-2 at ¶¶ 3—4; Doc. 15-11 at ¶ 9].

(3) On January 8, 2016, Dr. Apostoaei reported to Dr. Robertson that plaintiff had written the wrong medication on a patient record [Doc. 15-11 at ¶ 13].

(4) Other CRNAs and Hospital employees had reported concerns about plaintiff's vision and her ability to safely perform her job [Doc. 15-6 at ¶ 3; Doc. 15-10 at ¶¶ 7—8; Doc. 15-11 at ¶ 6, 9; Doc. 15-12 at ¶ 4].

Thus, the information before the employer was that plaintiff had made two clinical errors in administering (or failing to administer) anesthesia during surgery and one medication charting error. The physicians were also aware that other employees and staff had concerns about plaintiff's ability to safely treat patients and that two Hospital surgeons did not want her to practice on their patients. While plaintiff makes much of the change in testimony by Mr. Price as to the timing of the fracture table surgery, this evidence came to light through litigation and was not before the physicians at the time of their decision. Moreover, the correct date of the surgery is not the salient point; the issue is whether the physicians' understanding of plaintiff's actions during the surgery led them to conclude that she did not have the clinical skill or judgment to provide safe patient care. Similarly, plaintiff's dispute as to when Dr. Luhn entered the robotic surgery and when the patient showed twitches does not change what the physicians understood the facts to be at the time of their decision. Most importantly, although plaintiff has disputed certain facts regarding the reasons for her discharge, she has not presented evidence that Maryville Anesthesiologists did not honestly believe those facts at the time of her termination. *Braithwaite*, 258 F.3d at 494.

In sum, the evidence is that the clinical errors, based on the facts known at the time, led the defendant to conclude that plaintiff lacked the clinical judgment to provide safe anesthesia care to their patients. This is a sufficient reason to terminate plaintiff's employment. There is no evidence that the physicians did not honestly believe these facts or that the real reason for their decision was discrimination. Accordingly, plaintiff cannot

show that the stated reasons for her discharge were pretextual and summary judgment is appropriate.

**V.      Conclusion**

For the reasons set forth herein, the defendant's motion for summary judgment [Doc. 14] is **GRANTED**.  An appropriate order will be entered.


       s/ Thomas W. Phillips
SENIOR UNITED STATES DISTRICT JUDGE